UNITED STATES of America,
Plaintiff–Appellee,

v.

Gerisa K. EPPINGER, Defendant–
Appellant.

No. 94–2051.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 30, 1994.

Decided March 2, 1995.

Before BRIGHT,* BAUER and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

On December 17, 1993, Gerisa K. Eppinger pleaded guilty to one count of conspiracy to distribute cocaine in violation of 21 U.S.C. § 846. The defendant was sentenced on April 29, 1994 to nine years incarceration to be followed by five years of supervised release, and a special assessment of $50. Eppinger faced a mandatory minimum sentence of ten years, but received a downward departure for acceptance of responsibility. U.S.S.G. § 3E1.1(b)(1) and (2). She appeals her sentence on the grounds that her plea agreement called for a mandatory minimum sentence of only five years and furthermore, that she should have been allowed to present *in camera* testimony in support of her motion for another downward departure pursuant to U.S.S.G. § 5K1.1. We AFFIRM.

## I. FACTUAL BACKGROUND

On March 11, 1993, the Peoria, Illinois Police Department (PPD) received an anonymous phone call, indicating that a black woman, later identified as Gerisa K. Eppinger, would be departing shortly from the Peoria, Illinois airport for an unidentified southern state to purchase a large quantity of cocaine. The caller told the PPD that the woman would return to Peoria with the cocaine and sell it to Peoria drug dealers. Additionally, the caller provided the PPD with information about the defendant's residence and motor vehicle. Based on the foregoing information, the PPD began an extensive surveillance operation at the Peoria airport on March 13, 1993.

On March 14, 1993, at approximately 1:30 p.m., Eppinger was identified by the PPD when she purchased an airline ticket, with cash, from Peoria to Houston, Texas, under the name of Gerisa Kay Robinson. Once she left the ticket counter, PPD officers interviewed Tammi Bollinger, the ticket agent who assisted Eppinger. Bollinger told the

K. Tate Chambers, Asst. U.S. Atty., Peoria, IL (argued), for plaintiff-appellee.

Ronald E. Halliday, Parker & Halliday, Peoria, IL (argued), for defendant-appellant.

---

* The Honorable Myron H. Bright, Judge of the United States Court of Appeals for the Eighth Circuit, is sitting by designation.

agents that the woman who purchased the ticket called herself Kay Robinson, had traveled on the airline twice a month for the last six months, and always paid for her tickets in cash. Bollinger further related that the defendant usually traveled directly to Houston, with a single layover in St. Louis, but that on this trip, the defendant was going to travel to Chicago, Dallas, Longview, Texas, back to Dallas, and finally, to Houston.

Later that afternoon, PPD officers waited for Eppinger to board her plane, but she was late for the flight and missed it. Five minutes after the flight left, the defendant went to another ticket counter and purchased two tickets, one for herself under the name Gerisa Kay Robinson, and one for her eighteen-year-old daughter. She paid approximately $1100.00 in cash for both of these tickets. The tickets were to Houston, with a change of planes in St. Louis. Eppinger and her daughter boarded the plane which left at 6:25 p.m.

The PPD officers continued their surveillance of the Peoria airport as they waited for Eppinger to return. On March 16, 1993 they received another anonymous phone call telling them that the defendant would return on a flight that evening, with the cocaine. At approximately 10:20 p.m., Eppinger and her daughter were seen leaving a plane at the Peoria airport. The defendant was carrying a blue bag. After Eppinger and her daughter retrieved their luggage, PPD officers immediately approached Eppinger and her daughter and asked them to go to the United States Customs office at the airport. Eppinger agreed to go with the PPD officers and left the blue bag on the floor next to the chair on which she was sitting. Officer Bainter of the PPD carried the bag to the office.

In the Customs office, the PPD officers told Eppinger and her daughter that they were suspected of carrying narcotics and read Eppinger her *Miranda* rights, which she agreed to waive. After a drug-sniffing dog detected narcotics in one of the pieces of luggage, Eppinger admitted to Officer Kevin Kirwin that she purchased approximately

three kilograms of cocaine in Houston, which was in the blue bag. The officers searched her luggage and found 3.2 kilograms of cocaine and 2.6 grams of cocaine base (crack) along with nine pieces of gold jewelry and $4915.00 in United States currency. They performed a field test on the substance suspected to be cocaine and it tested positively for cocaine.

The following day, pursuant to a search warrant, the PPD officers conducted a search of Eppinger's residence. During the search, they found $1612.00 in United States currency, 165.6 grams of cannabis, a loaded .38 caliber Smith and Wesson snubnose revolver, a loaded Jennings semi-automatic handgun, several scales, several plastic zip-lock baggies, pagers, and ammunition. Later that day, when interviewed by PPD officers, Eppinger stated that between December, 1992 and March 16, 1993, she transported a total of approximately 12 kilograms of cocaine from Houston to Peoria.[1] She was given $22,000 to pay for each kilogram of cocaine and she earned $5000.00 per trip. Eppinger also told the officers that after she brought the cocaine to Peoria, a black male from Galesburg would come and pick up the cocaine.

On April 8, 1993, the government filed a one count indictment in the United States District Court in Peoria charging Eppinger with possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). A superseding indictment was filed on June 10, 1993, which also charged Eppinger with conspiring to distribute cocaine in violation of 21 U.S.C. § 846.

Although Eppinger originally pleaded not guilty to the charges, on December 17, 1993, the government and the defendant entered into a written plea agreement in which Eppinger pleaded guilty to the conspiracy charge in exchange for the government's dismissal of the charge of possession with intent to distribute. The government also agreed to request a three level reduction of Eppinger's offense level under the United States Sentencing Guidelines because of her cooper-

1. Upon reflection, Eppinger corrected her statement and alleged that she only transported a total of nine kilograms of cocaine from Houston to Peoria. The United States Attorney and the judge accepted the defendant's correction.

ation and acceptance of responsibility, it agreed to recommend that Eppinger be placed in a minimum security facility as close to her family as possible, and it agreed to recommend a sentence at the bottom of the guideline range if she complied fully with the terms of her agreement.

The plea agreement stated, in relevant part:

Count 1 carries a mandatory minimum penalty of five (5) years' imprisonment [and] up to forty (40) years' imprisonment.... The parties agree that as to Count 1 the defendant may receive any sentence authorized by statute up to and including the maximum sentences set out above. At the time of sentencing the government may recommend any sentence up to and including the maximum sentence.... If the defendant complies fully with the terms of this plea agreement, the government agrees to recommend a sentence at the bottom of the guideline range *as that range is determined by the court* or the mandatory minimum, whichever is greater. *The defendant acknowledges that this is only a recommendation and is not binding on the court.*

(Emphasis added). Both parties approved and signed the agreement.

At the change of plea hearing on December 17, 1993, the district judge fully admonished the defendant of the consequences of her plea, including the fact that the government's sentencing recommendation "is not binding on the court." He further stated that crime she was pleading guilty to carried with it a mandatory minimum sentence of five years, a maximum penalty of forty years, and that she could be sentenced to any time within that range.[2] He concluded by stating:

It is the finding of the Court ... that the defendant is fully competent and capable of entering an informed plea and that her plea of guilty is a knowing and voluntary plea supported by an independent basis in fact containing each of the essential elements of the offense. Her plea is therefore accepted and she is now adjudged guilty of that offense.

The Probation Office prepared a pre-sentence report. Based on the defendant's statement that she transported twelve kilograms of cocaine,[3] Eppinger's base offense level was assessed at 32, but with an adjustment for acceptance of responsibility, her adjusted level was 29. She also had one criminal history point, which led her to have a criminal history category of I.[4] Her sentencing guideline range was 87–108 months, but the Class A felony carried a mandatory minimum sentence of ten years, rather than the mandatory minimum of five years as she was previously informed by the government and the court.

Eppinger objected to the pre-sentence report based on the fact that she was told that her crime would carry only a five year, rather than a ten year, mandatory minimum sentence. She also claimed that there were factors in her case which warranted a downward departure, namely that she had no prior convictions, and that due to personal circumstances surrounding her family and financial situation, that she felt that she had no choice but to become involved in the drug trade. The defendant would not elaborate as to what these factors were, but she stated that she would like to testify as to these circumstances *in camera* at the sentencing hearing.

The sentencing hearing was held on April 29, 1994 and the first matter which the court addressed was whether Eppinger wished to change her plea to not guilty due to the fact that she was not told about the possible mandatory minimum of ten years at the plea change hearing. The following exchange took place:

THE COURT: It seems to me that the first matter that we have to address here

---

2. This is the sentence for a Class B felony.

3. Although Eppinger's statement that she only transported nine kilograms was accepted by the government and the court, it had no impact on the offense level, for transporting over five kilograms of cocaine is a Class A felony.

4. In 1990, Eppinger pleaded *nolo contendere* to a misdemeanor obscenity charge in Houston, Texas and was sentenced to six months probation, which was deferred.

today is the question of whether or not the defendant wishes to proceed on the basis of her plea of guilty because there is—perhaps one of you might state it better than I would—there is a concern or question concerning what she was told initially regarding the mandatory minimum.... Initially she was told at the time of the plea that the mandatory minimum was 5 years.... And if the Court finds a certain weight of drugs, it would be 10 years.... Have you talked about this with your client?

MR. HALLIDAY: Yes, Judge.

THE COURT: And, Ms. Eppinger, you understand that at the time you tendered your plea of guilty, you were informed that the mandatory minimum was 5 years and that may be in error, depending on the amount of drugs that the Court finds as part of the relevant conduct in this case. Do you understand that?

DEFENDANT: Yes, sir....

THE COURT: Because the Court did not inform you of those higher mandatory minimums at the time you tendered your plea, if you wish to withdraw your plea of guilty at this time you certainly would have that right to do that and renew a plea of not guilty to the charges in this case. Do you understand that you would have the right to do that? ... Have you discussed this with your attorney?

THE DEFENDANT: Yes, I have.

THE COURT: What is your wish at this point? Do you wish to withdraw your plea of guilty or do you wish to persist in your plea of guilty?

THE DEFENDANT: I would like to persist in the plea of guilty.

THE COURT: Could you make a short record of this Mr. Halliday?

MR. HALLIDAY: Your Honor, we discussed those facts which you just talked about, the differences and how the amounts could change the minimums. We took into consideration actions which the Government is going to recommend and taking those factors into consideration, she decided even if the Court were to rule that that may be a potential minimum, she wanted to persist in her plea of guilty.

THE COURT: But in that regard, I want you to understand that the fact the Government may make recommendations to me concerning certain issues in this case, I'm not required to accept them. Do you understand that?

THE DEFENDANT: Yes, sir, I understand....

THE COURT: Objection one was the matter we just discussed, the mandatory minimums and whether it was a Class B felony or Class A felony.

MR. HALLIDAY: We will withdraw that objection.

Eppinger then requested an *in camera* hearing to present evidence of how she became involved in drug trafficking in support of her request for a downward departure. The judge heard the attorneys in chambers, and Eppinger's attorney explained that she was forced into committing the crimes for which she was pleading guilty and that her family had been threatened in the past. Specifically, Eppinger alleged that her oldest child was threatened over the phone and that after she was arrested, someone drove by the defendant's house and fired a shot into one of her windows. The government did not dispute either of these statements.

The judge denied Eppinger's request for an *in camera* hearing because without a public hearing, the public would have no way of assessing the legitimacy of the court's decisions and sentencing. The court would only permit Eppinger to testify *in camera* as to pending investigations, but not as to past threats. The defendant chose not to testify in open court.

The government recommended a downward departure of ten percent from the mandatory minimum sentence of ten years and the defendant requested a departure of twenty-five percent. The court granted a ten percent reduction and sentenced Eppinger to 108 months incarceration, five years supervised release and a special assessment of $50.

## II. ISSUES

On appeal, the defendant raises the following issues: (1) whether the district court

erred in sentencing her to a mandatory minimum sentence of ten years rather than the mandatory minimum sentence of five years agreed to in the plea agreement; and (2) whether the district court erred in refusing to hear her testimony *in camera* in support of her motion for a downward departure from the mandatory minimum sentence.

### III. DISCUSSION

■ Although the defendant argues that the district court should have sentenced her within the range specified in the plea agreement, she withdrew her objection to the mandatory minimum sentence of ten years at the sentencing hearing. Thus, she waived this argument on appeal and we will only review the sentence for plain error. *United States v. Wallace*, 32 F.3d 1171, 1174 (7th Cir.1994). A plain error is "not only a clear error but an error likely to have made a difference in the judgment, so that failure to correct it could result in a miscarriage of justice," *id.*, and one that " 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' " *United States v. Olano*, — U.S. —, —, 113 S.Ct. 1770, 1779, 123 L.Ed.2d 508 (1993) (quoting *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)). Claims that a defendant was denied an adequate opportunity to present evidence at a sentencing hearing are reviewed for an abuse of discretion. *United States v. Cantero*, 995 F.2d 1407, 1412–13 (7th Cir.1993).

### A.

Eppinger argues that she and the government entered into a plea agreement in which she agreed to plead guilty to a Class B felony, which carried a mandatory minimum sentence of five years. She contends that the district judge erred in two respects when he sentenced her under the range for a Class A felony: (1) the plea agreement was entered into pursuant to Federal Rule of Criminal Procedure 11(e)(1)(C) and the crime level was therefore binding; and (2) the government and district court both knew she transported more than 5 kilograms of cocaine, and therefore, their repeated reference to a five year minimum sentence led her to believe that they would sentence her for a Class B felony regardless of the amount of cocaine she actually transported.

■ Eppinger's first claim is that she and the government entered into a plea agreement pursuant to Federal Rule of Criminal Procedure 11(e)(1)(C), a type C agreement,[5] in which they agreed that the appropriate sentence for the defendant should carry a mandatory minimum of five years in prison.[6] She contends that she pleaded guilty to a Class B felony and should be sentenced accordingly. The government argues that the plea agreement was made pursuant to Rule 11(e)(1)(B), a type B agreement, and that the court was not bound to accept a plea to the Class B felony and that it was free to consider all the relevant conduct of the defendant when calculating the proper sentence.

Initially, we are of the opinion that the agreement in question clearly was a type B agreement which made it clear that although the government promised to recommend a sentence in exchange for a guilty plea, the court was free to impose any sentence it considered proper in light of the defendant's conduct. We examined virtually the same

---

**5.** Federal Rule of Criminal Procedure 11(e) provides:

> (1) In General. The attorney for the government and the attorney for the defendant or the defendant when acting pro se may engage in discussions with a view toward reaching an agreement that, upon the entering of a plea of guilty or nolo contendere to a charged offense or to a lesser or related offense, the attorney for the government will do any of the following:
>
> (A) move for dismissal of other charges; or
>
> (B) make a recommendation, or agree not to oppose the defendant's request, for a particular sentence, with the understanding that such

recommendation or request shall not be binding upon the court; or

> (C) agree that a specific sentence is the appropriate disposition of the case.
>
> The court shall not participate in any such discussions.

**6.** The plea agreement in question also called for the government to move for dismissal of the charge for possession of cocaine with intent to distribute in exchange for Eppinger's guilty plea on the conspiracy charge. Both sides fully complied with this part of the agreement enter into pursuant to Rule 11(e)(1)(A).

issue in *United States v. Bennett*, 990 F.2d 998 (7th Cir.1993). In that case, the defendant entered into a plea agreement and agreed to plead guilty and cooperate with law enforcement officials. The government and Bennett could each recommend a sentence to the court, but the court would be bound by neither recommendation and Bennett did not have the right to change his guilty plea if the court imposed a sentence different from the one he anticipated. We held that this plea agreement, which "contained only the government's promise that it and Bennett could recommend to the district court whatever sentence either deemed appropriate," was clearly a type B agreement rather than a type C agreement. *Id.* at 1003. In so holding, we pointed out that the agreement clearly stated that the trial court was not bound by any agreement entered into by the defendant and the government, that the language of the agreement tracked the actual language of Rule 11(e)(1)(B), and that the judge informed Bennett several times that the court was free to sentence him to any time within the limits of the statute. *Id.*

In this case, the government never promised that a specific sentence would apply to Eppinger. In fact, the plea agreement specifically provided that "[t]he defendant acknowledges that this is only a recommendation and is not binding on the court." Furthermore, the language used in the plea agreement[7] specifically invoked Rule 11(e)(1)(B) and tracked its language, and the district judge carefully cautioned Eppinger at both the plea change hearing and the sentencing hearing that he was not required

to accept any of the recommendations of the government when determining her sentence. The judge further cautioned that "[t]his is the type of agreement where if I accept the terms of the agreement but I choose not to accept the recommendations of the parties in regard to certain matters, you would not have the right to withdraw your plea of guilty." There can be no doubt that both the government and the district court clearly and repeatedly informed Eppinger about both the nature and substance of her plea agreement and that it was a type B agreement "which did not limit the district court in any respect." *Bennett*, 990 F.2d at 1004.

■ Eppinger's second contention is that because both the judge and the government knew that she transported over five kilograms of cocaine prior to either the plea change hearing or the presentence report, their repeated reference to a five year minimum sentence led her to believe that they would sentence her for a Class B felony, with a five year minimum sentence. The government explains that they arrived at the five to forty year sentencing range based on their belief that they could only sentence Eppinger for the three kilograms of cocaine the PPD officers confiscated on December 16, 1993. The government was operating under the mistaken belief that the information about the other six kilograms was immunized information pursuant to Guideline 1B1.8.[8] It was only when the pre-sentence report came back that they became aware that Eppinger could be sentenced for the entire nine kilograms. The government also argues that it repeated-

---

7. The plea agreement provided, in relevant part: The parties agree that as to Count 1 the defendant may receive any sentence authorized by statute up to and including the maximum sentences set out above. At the time of sentencing the government may recommend any sentence up to and including the maximum sentence.... The defendant acknowledges that this is only a recommendation and is not binding on the court. The defendant may recommend whatever sentence she deems appropriate.... *This agreement is made pursuant to the Federal Rule of Criminal Procedure 11(e)(1)(B),* and therefore if the court does not accept the recommendations of the parties, the defendant does not have the right to withdraw her plea of guilty.
(Emphasis added).

8. United States Sentencing Guideline 1B1.8 provides:

(a) Where a defendant agrees to cooperate with the government by providing information concerning unlawful activities of others, and as part of that cooperation agreement the government agrees that self-incriminating information provided pursuant to the agreement will not be used against the defendant, then such information shall not be used in determining the applicable guideline range, except to the extent provided in the agreement.
(b) The provisions of subsection (a) shall not be applied to restrict the use of information:
(1) known to the government prior to entering into the cooperation agreement.

ly, and in writing, made it clear to Eppinger that the court could determine that another sentence was appropriate. Finally, the government points out that once Eppinger became aware of the fact that she was going to be sentenced for a Class A felony, the judge gave her an opportunity to withdraw her plea of guilty and proceed to trial. She knowingly and voluntarily refused to accept the offer and advised the court that she wished to proceed with her plea even though she was facing a penalty of ten years, a sentence greater than the mandatory minimum referred to in the plea agreement.

■ "[T]he government is not bound by the preliminary calculations of the guideline ranges" for defendants. *United States v. Bennett,* 716 F.Supp. 1137, 1142 (N.D.Ind. 1989), *aff'd,* 907 F.2d 152 (7th Cir.1990). Rather, a "plea bargain is a contract, the terms of which must be interpreted in light of the parties' reasonable expectations. The resolution of each case depends upon the essence of the particular agreement and the Government's conduct relating to its obligations in that case." *United States v. Mooney,* 654 F.2d 482, 486 (7th Cir.1981) (citation omitted). Interpretations of disputed terms in a plea agreement should be based on objective standards. *United States v. Strawser,* 739 F.2d 1226, 1229–30 (7th Cir.), *cert. denied,* 469 U.S. 1038, 105 S.Ct. 518, 83 L.Ed.2d 407 (1984).

In *Bennett,* the district court held that in light of Seventh Circuit case law, as long as the actual sentencing range fell within the legitimate expectation created by the range specified in the plea agreement, the eventual sentence would be proper. 716 F.Supp. at 1145–46. The plea agreement stated that the defendant's sentence would range from five to forty years, "as that range is determined by the court." At the plea change hearing, the judge informed the defendant no fewer than four times that he was not bound by the recommendations of the government. Furthermore, the judge specifically told Eppinger that "the Court will not be able to determine the guideline sentence for your case until after the pre-sentence report has been completed and you and the Government have

had an opportunity to challenge the facts reported by the probation officer."

Although the preliminary calculation made by the government and the judge were incorrect as to the mandatory minimum sentence that Eppinger was facing, there can be no doubt that she was given fair notice that the sentence was subject to modification. Additionally, the defendant's sentence, although longer than she had hoped, still fell well within the five to forty year range which she expected, and even with the Class A felony conviction, she fell far short of the maximum sentence she could have received for a Class B felony.

Objectively, Eppinger's reasonable expectations created by the plea agreement were met. The judge and the government repeatedly warned her that her actual sentence would be determined in the pre-sentence report, and until then, no estimates were set in stone. During the plea change hearing, the judge asked the defendant's attorney what he advised his client as to the worst case scenario of pleading guilty. The following colloquy ensued:

THE COURT: Can you tell me a little bit about your discussion with her about a worst case scenario here in a sense?

MR. HALLIDAY: We went through the guidelines and I explained to her that the amount that could allegedly be charged would include not just the offense that she had on her that day, but I explained the—I explained the specifics of the guidelines and the number of months that it would go into and I went over the—I had the book out with her ... [and] showed her where I thought it would fall, discussed her criminal record with her, told her what the points would probably be, but we would have to wait and see....

THE COURT: *What was your worst case scenario for her?* ...

MR. HALLIDAY: *121 to 151 was the one I think.*

THE COURT: *There is a range of 121 to 151. Is that the one you're talking about?*

THE DEFENDANT: *Yes, sir.*

THE COURT: That's your attorney's best estimate of a worst case scenario. Do you

understand that because of certain circumstances that may be found to be different or rulings of the Court that may not comport with his understanding of the law, *it's conceivable the range could end up higher than that? Do you understand?*

THE DEFENDANT: *Yes, sir.*

(Emphasis added). Eppinger not only knew that she was facing a potential sentence of ten years, but that she could even serve a longer period of incarceration.

Finally, and most importantly, when faced with the mandatory minimum sentence of ten years, the district judge gave the defendant the chance to withdraw her plea of guilty and enter a plea of not guilty and go to trial, even though the sentence still fell well within the range of her legitimate expectations. The judge was under no duty to allow her to change her plea. The written agreement specifically stated that once Eppinger's plea was accepted, she could not withdraw it merely because the final sentence was greater than what she anticipated. The district court specifically informed Eppinger of the same fact at the plea change hearing. Yet once the mandatory minimum came in higher than the five years of which she was warned, the judge still gave Eppinger the chance to change her plea to not guilty and proceed to trial. Her attorney advised her of all the ramifications of the mandatory minimum sentence of ten years and in spite of the greater sentence, and the judge's warning her that he was not required to grant her any downward departure in sentence, she knowingly, intelligently, and voluntarily persisted in her plea of guilty.[9]

Eppinger and the government entered into a type B agreement which, once signed, bound Eppinger to her plea of guilty but did not bind the district court to the sentencing recommendations contained in the agree-ment. The defendant was fully informed of the court's discretion in sentencing her including the fact that the calculation of the actual offense level would be determined by the pre-sentence report and that the sentence was in the sole discretion of the district judge, based upon his reading of the pre-sentence report. Finally, when Eppinger was faced with a greater sentence than the one she anticipated, the judge gave her the chance to withdraw her plea, enter a plea of not guilty, and proceed to trial. In light of all these factors, we hold that the district court did not commit plain error when it sentenced Eppinger under a mandatory minimum of ten years rather than the five years as stated in the original plea agreement.

### B.

 Eppinger's next argument is that the district judge abused his discretion when he refused to hear evidence in support of her motion for a downward departure *in camera*.[10] The defendant claimed to be afraid to speak in open court about the circumstances surrounding her involvement in the drug trade, because she and her family had received a number of threats prior to the sentencing hearing. Eppinger contends that if the court heard all the evidence about how and why she became involved with transporting drugs, it may have granted her a downward departure of more than ten percent. The government maintains that the judge properly denied the request for an *in camera* proceeding because Eppinger did not establish compelling reasons sufficient to outweigh the public's First Amendment right of access to the sentencing hearing.

The public's right of access to court proceedings and documents is well-established. Public scrutiny over the court system serves to (1) promote community re-

---

9. The following exchange took place at the sentencing hearing:

 THE COURT: *The mandatory minimum is 120, right. As I understand it, counsel, the sentencing profile here would be a level 29, criminal history category of I. The guideline range is 87–108, but there's a mandatory minimum of 120.... Do counsel agree that is the sentencing profile that results from the findings of the court?* ...

 MR. HALLIDAY: The defendant does, Your Honor.

10. United States Sentencing Guideline 6A1.3 provides, in relevant part:

 (a) When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor.

spect for the rule of law, (2) provide a check on the activities of judges and litigants, and (3) foster more accurate fact finding.... The First Amendment presumes that there is a right of access to proceedings and documents which have 'historically been open to the public' and where the disclosure would serve a significant role in the functioning of the process in question. This presumption is rebuttable upon demonstration that suppression 'is essential to preserve higher values and is narrowly tailored to serve that interest.' *Grove Fresh Distributors, Inc. v. Everfresh Juice Co.,* 24 F.3d 893, 897 (7th Cir.1994) (quoting *Press–Enterprise Co. v. Superior Court,* 464 U.S. 501, 510, 104 S.Ct. 819, 824, 78 L.Ed.2d 629 (1984)). "The public has a strong First Amendment claim to access to evidence admitted in a public sentencing hearing." *United States v. Carpentier,* 526 F.Supp. 292, 294–95 (E.D.N.Y.1981) (citing *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 585–86, 100 S.Ct. 2814, 2832, 65 L.Ed.2d 973 (1980)). "The public must have the opportunity to observe and criticize the judiciary in the operation of its duties. In sentencing, unlike other aspects of criminal proceedings, it is the distinct province of the court to determine what constitutes proper sentence." *Id.* at 295.

In this case, Eppinger wanted to testify as to how she was coerced into drug trafficking and how she and her family were threatened once she began cooperating with the authorities. Eppinger's attorney, however, had previously advised the court that Eppinger got involved in drug trafficking when one of her friends left town owing some other friends drugs. For some unknown reason, these friends decided to hold her accountable for the loss and as a result, she felt that she was compelled to begin transporting drugs in order to make up for that loss. Furthermore, while the government and the district court believed that Eppinger and her family did, in fact, receive threats on numerous occasions, her cooperation with the government was already part of the public record, which is why Eppinger and her family were being threatened in the first place. At most, she would have simply reiterated the information about the threats to the judge and perhaps given some more details about her initial involvement with trafficking.

"The difficulties inherent in quantifying the First Amendment interests at issue require that we be firmly convinced that disclosure is inappropriate before arriving at a decision limiting access. Any doubts must be resolved in favor of disclosure." *Grove Fresh,* 24 F.3d at 897. In order for Eppinger to overcome the presumption that sentencing hearings should be public, she would have had to show compelling reasons for the court to hear her testify *in camera.* While her fears may have been real, most of the substance of her proposed testimony was already part of the public record. As a result, her claim that she may have received a more lenient sentence if her testimony had been heard *in camera* is without merit. The trial judge was aware of why she felt coerced into transporting drugs and further that she was being threatened because of her cooperation with the government. He agreed with the recommendation of the government and granted a ten percent downward departure from the mandatory minimum sentence. Moreover, Eppinger offered no persuasive reasons as to why the judge would have granted her a larger reduction in sentence even if he did know more details of her involvement in the drug trade. In light of all the facts in the record, we hold that the district judge did not abuse his discretion by refusing to hear Eppinger's testimony *in camera* in support of her request for a downward departure.

Accordingly, the judgment of the district court is

AFFIRMED.